The ESTATE OF Raymond LEE, By and Through co-personal representatives Juliann L. McGARRAH and Dinah L. Merritt, Appellant–Plaintiff,

v.

LEE & URBAHNS COMPANY, an Indiana general partnership, and John B. Urbahns, individually and in his capacity as general partner in Lee & Urbahns, Allison Run II, an Indiana general partnership, Allison

Run III, an Indiana general partnership, Green Ridge Development, LLC, an Indiana limited liability corporation, Fortune Park Associates Limited Partnership, an Indiana limited partnership, F.P. Buildings 3 & 4 Limited Partnership, an Indiana limited partnership, Fortune Park Associates Building No. 7 Limited Partnership, a Minnesota limited partnership, Fortune Park Associates Building No. 8 Limited Partnership, a Minnesota limited partnership, Fortune Park Associates Building No. 9 Limited Partnership, an Indiana limited partnership, Fortune Park Associates Building No. 14 L.P., an Indiana limited partnership, U.S. 421, an Indiana limited partnership, Wayne Township, LLC, an Indiana limited liability corporation, Whitehall Associates, L.P. an Indiana limited partnership, John B. Urbahns in his capacity as general partner in Allison Run II, an Indiana general partnership, general partner in Allison Run III, an Indiana general partnership, the managing member of Green Ridge Development, LLC, an Indiana limited liability corporation, general partner in Fortune Park Associates Limited Partnership, an Indiana limited partnership, general partner in F.P. Buildings 3 & 4 Limited Partnership, an Indiana limited partnership, general partner in Fortune Park Associates Building No. 7 Limited Partnership, a Minnesota limited partnership, partner in Fortune Park Associates Building No. 8 Limited Partnership, a Minnesota limited partnership, general partner in Fortune Park Associates Building No. 9 Limited Partnership, an Indiana limited partnership, general manager of Fortune Park Associates Building No. 14 L.P., an Indiana limited partnership, partner in U.S. 421, an Indiana limited partnership, the managing member of Wayne Township, LLC, an Indiana limited liability corporation, and partner in Whitehall Associates, L.P. an Indiana limited partnership, Appellees–Defendants.

No. 49A02–0610–CV–933.

Court of Appeals of Indiana.

Nov. 14, 2007.

Charles R. Whybrew, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorney for Appellant.

Cathy Elliott, Bryan H. Babb, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant–Plaintiff the estate of Raymond O. Lee ("the Estate") appeals from the trial court's entry of judgment in favor of Lee & Urbahns Company and John B. Urbahns, individually and in his capacity as general partner in Lee & Urbahns, and several other named defendants (collectively, "Defendants"). The Estate contends that the trial court abused its discretion in refusing discovery of Urbahns's personal information, in refusing to admit a November 10, 2006, deposition of Rick Martin (a former employee of Lee & Urbahns), and in refusing to allow it to recall a witness in the second part of the bifurcated bench trial. The Estate further challenges the trial court's finding that it never informed Urbahns prior to trial that

it needed to review additional documents. We affirm.

## FACTS

In approximately 1981, Raymond O. Lee and John B. Urbahns began developing land together as "Lee & Urbahns Company," a general partnership. Lee and Urbahns participated in several joint projects over the years, generally creating separate limited partnerships for each development. Both Lee and Urbahns also participated in projects on their own and with other partners. Lee & Urbahns Company did not participate directly in any of the real estate developments, but, rather, provided office space for Lee and Urbahns to run their respective business entities. Among the projects in which Lee and Urbahns participated together was U.S. 421, a limited partnership in which both held a 25% interest and which consisted of a parcel of approximately four acres in northwest Marion County. Lee and Urbahns also owned a nearby 2.6–acre parcel as tenants-in-common.

Lee died on March 15, 2001. Soon thereafter, Urbahns's attorney Barb Wolenty delivered to the Estate "an initial package of things [she] thought they would find helpful[.]" Tr. p. 497. At some point during the summer of 2001, the Estate gave Wolenty a list of documents that it needed in order to perform an independent appraisal, a list that Wolenty passed on to Lisa Reuter, Lee & Urbahns Company's accountant. In November of 2001, Reuter provided the Estate with a "[t]otal accounting as of the date of death" as to each relevant business entity. Tr. p. 1188. Later, Reuter provided the Estate with tax returns and financial statements for the years 1999 through 2002 for Lee & Urbahns Company and real estate developments Allison Run 2 and 3, Fortune Park 1, 2, 3, 4, 7, 8, and 9, Fortune Park 14 Building, U.S. 421, Wayne Township, Whitehall Phase 2, and Green Ridge. Although cash was occasionally transferred from entity to entity, Reuter gave the Estate all the documents it needed to trace the flow of that cash.

At some point, Urbahns had formed SMN Restaurants ("SMN"), a limited-liability corporation whose purpose was to collect properties that would then be sold to Costco and on which Costco would build a new store. In approximately February of 2002, SMN purchased the four-acre U.S. 421 tract and the 2.6–acre tract that had been owned by Lee and Urbahns as tenants-in-common. SMN paid U.S. 421 approximately $140,000 per acre and paid approximately $230,000 per acre for the tenants-in-common parcel, which was fair market value. Ultimately, the total amount of land Costco purchased from SMN was approximately fourteen acres, for which the total consideration paid was approximately $7,000,000.[1]

On January 23, 2003, Lee's daughter Linda McGarrah met with former Lee & Urbahns employee Rick Martin. Soon thereafter, on March 14, 2003, the Estate filed suit against Urbahns, Lee & Urbahns Company, and several other entities, which were apparently all of the partnerships and corporations that Lee and Urbahns had formed together over the years. The complaint alleged that Urbahns had failed to timely provide a full accounting of his and Lee's joint business activity to the

---

1. Included in this total amount were "a variety of construction escrows[,] substantial brokerage fees paid to the Costco broker[, and] substantial off-site development costs that [Urbahns] had to pay to just make the transaction." (Tr. 766). The total amount of these costs borne by SMN is not detailed in the record, but it seems clear that SMN received far more from Costco for the parcels in question than it paid.

Estate, that Urbahns had breached common law and statutory duties to the Estate, that Urbahns had committed conversion of certain of the Estate's assets, and that Urbahns had committed fraud, constructive fraud, and *ultra vires* acts by concealing information from the Estate for financial gain.

On May 18, 2004, the Defendants filed a motion to bifurcate issues and stay discovery. In its order granting the motion, the trial court ruled that any issues of punitive damages would be addressed in a separate phase of the trial and that the Estate was prohibited from discovering Urbahns's private financial information.

On March 7, 2005, the bench trial began. After three days, the trial court suspended the trial in order to allow the Estate time to secure Martin's testimony. On March 26 and May 14, 2005, Martin was deposed. On July 1, 2005, the trial court, in ruling on an Estate motion, ordered that the Estate could no longer seek discovery "by way of a Motion to Compel in the middle of a trial on the merits[.]" Appellant's App. p.2053.

On October 27, 2005, the Defendants filed an emergency motion for protective order after learning that the Estate had scheduled another deposition of Martin for November 10. On October 31, 2005, the trial court issued a protective order, providing in part that "[t]he Estate shall not seek to take any further depositions of Martin (or any other witness)[.]" Appellant's App. p. 2113. On November 10, 2005, the Estate nevertheless deposed Martin in Georgia with no defense attorneys present.

When the trial resumed on November 21, 2005, the trial court denied the Estate's motion to admit Martin's November 10 deposition. The trial court also denied the Estate's request to recall Lee's attorney David Shelton, who had testified in the March phase of the trial, on the basis that the request was not based on any new evidence, but, rather, was based on public documents that had been on file for approximately three years. According to the Estate's offer of proof, Shelton would have testified, *inter alia*, that Urbahns retained all of the proceeds from the sale of a third 1.3–acre parcel to SMN that, in fact, was owned by U.S. 421, that Urbahns underpaid the Estate for the four-acre U.S. 421 parcel and the tenants-in-common parcel, and that the total damages to the Estate were $918,906.01.

On September 25, 2006, the trial court issued its Findings of Fact, Conclusions of Law and Entry of Final Judgment, in which it ruled in favor of Defendants on all counts. The trial court concluded, *inter alia*, that Defendants had satisfied the requirements of the Indiana Surviving Partner Act, the Estate failed to present any evidence that it had suffered any injury resulting from any of Urbahns's actions, and the Estate failed to present any evidence of a breach of fiduciary duty, conversion, fraud, or *ultra vires* acts.

## DISCUSSION AND DECISION

### I. Standard of Review

When, as here, the trial court enters findings of fact and conclusions thereon, we apply the following two-tiered standard of review: we determine whether the evidence supports the findings and the findings support the judgment. *Clark v. Crowe,* 778 N.E.2d 835, 839 (Ind.Ct.App. 2002). The trial court's findings of fact and conclusions thereon will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* at 839–40. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made.

*Id.* at 840. This court neither reweighs the evidence nor assesses the credibility of witnesses, but considers only the evidence most favorable to the judgment. *Id.*

## II. Discovery of Urbahns's Personal Financial Information

 The Estate contends that the trial court abused its discretion in denying its request to discover certain of Urbahns's personal financial records. "A trial court enjoys broad discretion when ruling upon discovery matters and we will interfere only where an abuse of discretion is apparent." *Davidson v. Perron*, 756 N.E.2d 1007, 1012 (Ind.Ct.App.2001) (citing *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 308 (Ind.Ct.App.2000)). "An abuse of discretion occurs where the decision is against the logic and natural inferences to be drawn from the facts of the case." *Id.* "Because of the fact-sensitive nature of discovery issues, a trial court's ruling is cloaked with a strong presumption of correctness." *Id.* "Thus, we will affirm the ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court." *Mullins v. Parkview Hosp., Inc.*, 830 N.E.2d 45, 59 (Ind.Ct.App.2005), *reh'g denied, aff'd in relevant part, Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608 (Ind. 2007).

> As a general rule,
>
> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Ind. Trial Rule 26(B)(1).

The scope of discovery is not unlimited, however. Trial Rule 26(C), which governs protective orders, provides in relevant part:

> Upon motion by any party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the county where the deposition is being taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (1) that the discovery not be had;
>
> (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;
>
> (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
>
> (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters[.]

 Although styled a "stay of discovery," the trial court's order prohibiting discovery of certain of Urbahns's personal information is essentially a protective order providing that discovery of the information in question could only be had under certain circumstances, *i.e.*, if the Estate showed at trial by clear and convincing evidence that it was entitled to punitive damages. Under Trial Rule 26(C), the burden is initially on the party seeking the

protective order to show "good cause" why such an order is required to protect it from "annoyance, embarrassment, oppression, or undue burden or expense[.]" Once a showing of good cause has been made, the burden shifts to the party seeking discovery of protected material to establish that the trial court's protective order constitutes an abuse of discretion. *See State Wide Aluminum, Inc. v. Postle Distributors, Inc.,* 626 N.E.2d 511, 518 (Ind.Ct. App.1993) ("Because State Wide is seeking a partial release of information obtained under an Ind. Trial Rule 26(C) protective order, it bears the burden of showing that the trial court's use of the protective order was an abuse of discretion."); *Geib v. Geib's Estate,* 182 Ind.App. 377, 380–81, 395 N.E.2d 336, 338 (1979) ("Appellant's burden was to show that the trial court's use of TR. 26(C)(3) was an abuse of discretion under the particular facts and circumstances of this case and this she has failed to do.").[2] The questions, then, are whether the Defendants showed good cause why a protective order should issue and, if so, whether the Estate established that the trial court abused its discretion in issuing one.

At issue, of course, were certain of Urbahns's personal financial records. Specifically, the Estate requested production of

[Request] No. 1: Urbahns' personal and unrelated businesses' income tax returns for the last five (5) years.

. . . .

Request No. 3: Urbahns' personal and unrelated businesses' Bank statements for all accounts for the last five (5) years.

. . . .

Request No. 4: The general ledge[rs] for Urbahns' unrelated businesses for the last five (5) years.

. . . .

Request No. 6: All accounting firm's [sic] work papers relating to the documents requested in Request for Production No. 5.

. . . .

Request No. 7: All projections, budgets, and forecasts prepared for or by Urbahns, including those prepared for financial purposes, for Urbahns personally as well as his unrelated business entities.

. . . .

Request No. 8: All loan agreements related to Urbahns personally and Urbahns' unrelated business enterprises that were created, generated, or executed during the last five (5) years.

. . . .

Request No. 9: Each document that evidences the payment of any money to Urbahns personally and Urbahns' unrelated business enterprises during the last five (5) years.

. . . .

Request No. 10: Each document related to the construction of Urbahns' home, which includes bills, invoices, cancelled checks, pay requests, contracts, and financial records.

. . . .

Request No. 11: Each document which comments upon, mention[s], pertain[s] to and/or relate[s] to the development and construction of the Costco at 9010 Michigan Road, including attorney

---

**2.** This rule appears to be at odds with federal precedent on the point, which, as the Estate points out, is that the entity *resisting* discovery has the burden of showing that a protective order is warranted. *See, e.g., Jones v. Hirsch-feld,* 219 F.R.D. 71, 74–75 (S.D.N.Y.2003) ("The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant.").

files, attorney's notes, loan documents, land acquisition records, purchase agreements, surveys, title commitments, financial records and correspondence.

. . . .

Request No. 12: All attorneys' fee statements, invoices, billing records and time sheets of Robinson Wolenty & Young, LLP for services performed for Urbahns personally and Urbahns' unrelated businesses.

Appellant's App. pp. 669–71.

Defendants countered that the Estate was seeking "highly sensitive, private, and confidential financial information about Urbahns" and characterized its requests as "over reaching, harassing in nature, and . . . an intentional invasion of Urbahns' right of privacy to his personal financial matters[.]" Appellant's App. pp. 501–02. On appeal, the Estate argues that the Defendants failed to carry their burden to show that a protective order was warranted and that Indiana recognizes no generalized privacy interest.

■ As previously mentioned, the Defendants' burden below was to show "good cause" why a protective order should issue and, once good cause was shown, the Estate's burden was to show that such an order constitutes an abuse of discretion. *See State Wide Aluminum,* 626 N.E.2d at 518. Moreover, we conclude that Trial Rule 26(C), at least, does recognize a privacy interest. As the United States Supreme Court has recognized, "[i]t is clear from experience that pretrial discovery . . . has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34–35, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). We also agree that "[a]lthough [Federal Rule of

Civil Procedure 26(c), on which Trial Rule 26(C) is modeled,] contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule." *Id.* at 35 n. 21, 104 S.Ct. 2199. In the same vein, this court has recognized that "Rule 26(C) protects an individual from 'fishing expeditions' into irrelevant or privileged material[,]" which is precisely what personal financial information would be in many cases. *Dahlin v. Amoco Oil Corp.,* 567 N.E.2d 806, 814 (Ind.Ct.App.1991) (quoting *Collins v. Bair,* 256 Ind. 230, 241, 268 N.E.2d 95, 101 (1971)). The question, then, is whether personal financial records would be covered by the privacy interest protected by Trial Rule 26.

■ It seems self-evident that a person's personal financial records dating back five years, including tax returns, bank statements, details regarding money spent on attorneys and one's house—essentially, from where each dollar came and to where each dollar went—are something almost all persons would prefer to keep private. For purposes of Trial Rule 26(C), a request for such records would be, for most, annoying and quite likely embarrassing, unduly burdensome, and expensive as well. We think that rare is the person, even one of clear conscience, who would unhesitatingly respond to such a request without being compelled, even with assurances of confidentiality. We believe that, in almost all cases, such a request confers good cause on the opposing party if it wishes to oppose it. We see nothing in the record here to suggest that this case should be an exception to that general rule and therefore conclude that the Defendants carried their burden to show good cause under Trial Rule 26(C).

Consequently, the burden then shifted to the Estate to establish that the protective order constituted an abuse of discretion. We conclude that the Estate failed to carry this burden. Under the circumstances of this case, it was perfectly reasonable to require the Estate to make *some* showing, beyond mere assertions, before it could be allowed to discover Urbahns's personal financial information. This the Estate ultimately failed to do. The trial court made several comments during an argument on the Estate's request:

It's always been a bare contention, and that's been the problem.

. . . .

I mean, is a bare assertion enough to overcome all the objections to privilege and privacy that the United State Supreme Court holds dear? My comment is no.

. . . .

My accountant told me if I want to prove fraud on your part, or embezzlement, I have to have all your personal documents. And I'm saying to you that that does not rise to the level of being able to discover those things.

So, the problem that I' [m] struggling with is that we're dealing with bare assertions. Not only that, we're dealing with bare assertions that are confronted with affidavits to the exact contrary.

Tr. pp. 96–98.

It is worth noting that the Estate never disputed these observations by the trial court, insisting all along that it was entitled to the discovery at issue without any factual showing. Moreover, the Estate does not even argue on appeal, much less establish, that it made any kind of factual showing that discovery of Urbahns's personal financial information was warranted, and we conclude that the unsupported assertions here were insufficient to show that the protective order was an abuse of discretion.[3]

### III. Martin's November 10, 2006, Deposition

█ The Estate contends that the trial court abused its discretion in declining to admit evidence of Martin's November 10, 2006, deposition. Indiana Trial Rule 32(A) governs the use of depositions in court proceedings and provides in relevant part, "[a]t the trial . . ., any part or all of a deposition, so far as admissible under the Rules of Evidence applied as though the witness were then present and testifying,

---

**3.** The Estate argues, *inter alia*, that the trial court abused its discretion in concluding that such evidence could only ever be used for the purposes of establishing punitive damages and requiring them to prove that they were entitled to such damages by clear and convincing evidence before they could discover Urbahns's personal financial information. While we might be inclined to agree that the trial court set the bar too high in this regard, we need not so decide, as the Estate never even left the ground.

Additionally, we do not mean to suggest that there are no circumstances under which discovery of personal financial information during a liability phase would be appropriate. For example, had the Estate put before the trial court documents indicating an unexplained disbursement by one of the partnerships of, say, $25,234.25 on one day and that Urbahns had purchased a car the next day for $25,234.25, such a showing would clearly, in our view, justify discovery of at least some of Urbahns's personal financial records.

As a final point, the effects of a decision to the contrary on this point are·worth pondering. Were we to accept the Estate's position, *i.e.*, that discovery of personal financial records should always be allowed when there is a mere allegation that they might be relevant and useful, then the potential for abuse of such a request would increase exponentially. Moreover, adoption of the Estate's position would greatly weaken, if not entirely eviscerate, the protections of Trial Rule 26(C).

may be used ... by or against any party who had reasonable notice thereof[.]" The admission or exclusion of a deposition is within the sound discretion of the trial court. *LKI Holdings, Inc. v. Tyner,* 658 N.E.2d 111, 116 (Ind.Ct.App.1995), *trans. denied.* We will reverse the trial court only if we determine that an abuse of discretion occurred. *Kellems v. State,* 651 N.E.2d 326, 328 (Ind.Ct.App.1995).

■ We need not reach the merits of the Estate's claim in this regard, as we conclude that it has failed to show how the exclusion of Martin's deposition prejudiced it. In short, the trial court, noting the inconsistencies in the depositions it *did* admit at trial, specifically found that "Mr. Martin is simply not a credible witness[,]" Appellant's App. p. 55, a finding not challenged by the Estate and one we would not disturb in any event. Given that the trial court found Martin to be incredible after evaluating his first three depositions, there is no reason to believe (and the Estate offers none) that yet another inconsistent account by Martin would have altered the trial court's finding in this regard. Even assuming, *arguendo,* that the trial court abused its discretion in failing to admit Martin's November 10, 2006, deposition, any such abuse can only be considered harmless.

### IV. Shelton's Recall

■ The Estate contends that Shelton's recall in December of 2005 was necessary because he was set to testify regarding newly discovered evidence that had come to light since the trial was suspended the previous March. The Defendants counter that the newly discovered evidence about which Shelton was to testify was, in fact, no such thing and consisted of public documents that had been filed more than three years previously. Indiana Evidence Rule 611 provides, in relevant part, that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." "Whether a litigant is permitted to recall a witness rests within the sound discretion of the trial judge." *May v. State,* 263 Ind. 690, 693, 338 N.E.2d 258, 260 (1975). Although we are unable to find an Indiana case on point, we conclude that the standards governing a Motion for Relief from Judgment pursuant to Trial Rule 60(B) based on newly-discovered evidence are sufficiently analogous to aid us in our disposition of this issue.

■ In the Trial Rule 60(B) context, the question "is addressed to the 'equitable discretion' of the trial court; the grant or denial of the T.R. 60(B) motion 'will be disturbed only when that discretion has been abused.'" *Rogers v. R.J. Reynolds Tobacco Co.,* 731 N.E.2d 36, 51 (Ind. Ct.App.2000) (citing *Fairfield v. Fairfield,* 538 N.E.2d 948, 949–50 (Ind.1989)). "In making the decision, the trial court is required to 'balance the alleged injustice suffered by the party moving for relief against the interests of the winning party and society in general in the finality of litigation.'" *Id.* (citing *Chelovich v. Ruff & Silvian Agency,* 551 N.E.2d 890, 892 (Ind.Ct.App.1990)).

While it is true that judgment had not yet been entered here, the litigation was already essentially "final" in some respects. The trial court made it abundantly clear that trial was being continued for the *sole* purpose of receiving Martin's testimony, foreclosing the presentation of any other evidence, including Shelton's testimony. By attempting to recall Shelton, the Estate was essentially seeking to reopen a phase

of the trial that had been determined to be closed. Under the circumstances, we feel that the need to serve the interests of finality are only slightly less compelling here, if at all, than if judgment had already been entered and the Estate were pursuing a Motion for Relief from Judgment pursuant to Trial Rule 60(B).

Indiana courts have formulated a nine-element test, each of which the moving party must satisfy, in order to receive a new trial based on newly-discovered evidence.

> [N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000). "[T]he nine-factor approach used to evaluate newly-discovered evidence places a high value on finality of judicial resolutions." *Stephenson v. State*, 864 N.E.2d 1022, 1049 (Ind.2007). "As a result, the nine-factor approach 'is a rigorous one.'" *Id.* (citing *Vacendak v. State*, 264 Ind. 101, 108, 340 N.E.2d 352, 358 (1976)).

An analogous nine-element test in this context would be (1) the evidence has been discovered since the first phase of trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for the first phase of trial; (7) the evidence is worthy of credit; (8) it can be produced in the second phase of the trial; and (9) it will probably produce a different result at retrial.

Application of the above test leads us to conclude that the Estate failed to satisfy at least one of the above elements, that due diligence was used to discover it in time for the first phase. For the most part, the evidence the Estate claims was newly discovered consists of public records filed in February of 2002, over two years before trial started and nearly three years before the second phase. Among the documents is a quitclaim deed dated February 13, 2002, granting land under a vacated road across a parcel allegedly owned by U.S. 421 from the Indianapolis Department of Public Works directly to SMN. This shows, the Estate contends, that Urbahns committed misconduct against the Estate, as the grant from Indianapolis should have been to U.S. 421, and the grant directly to SMN cheated the Estate out of its share of the proceeds when the parcel was sold to Costco. The Estate, however, does not claim, much less establish, that it could not have found these documents before the first phase had it exercised due diligence, only that the exclusion of Shelton's testimony regarding them prejudices them.

Be that as it may, it seems to us that, in a case such as this, which involved tracing money through various real estate transactions, the trial court did not abuse its discretion in concluding, as it apparently did,[4] that the Estate should have found and examined the documents in question before the first phase. There is nothing in

---

4. The trial court did not articulate any specific reason on the record for denying the Estate leave to recall Shelton, nor did it address the issue in its findings. We are mindful, however, that "on appellate review the trial court's judgment will be affirmed if sustainable on any theory or basis found in the record." *Havert v. Caldwell*, 452 N.E.2d 154, 157 (Ind. 1983).

the record to suggest that examination of such readily-accessible documents would be out of the ordinary in a case such as this. Additionally, other facts and circumstances bolster the conclusion that the Estate, in general, failed to exercise due diligence almost as a matter of course.

The record contains several indications of what appears to be the Estate's general lack of diligence and its propensity for bringing up issues at the last moment. For example, the trial court noted at the beginning of the second phase of trial, "Consistent with the practice of the Estate this morning the Court was presented with five motions on the morning of trial." Tr. p. 928. The trial court noted that, although the Estate claimed to have become aware of the issues that warranted Shelton's recall after Martin's March 26, 2005, deposition, it said nothing regarding the matter until the first day of the second phase in December. Yet another example of the Estate's practice during this case is that it made no attempt to secure Martin at the first phase of trial until six days beforehand. Despite being provided with approximately sixty boxes of documents concerning the various Lee & Urbahns ventures in April and May of 2004, with the exception of an initial forensic review performed by a certified public accountant, no person working on behalf of the Estate ever reviewed the documents. All in all, we believe that the record supports a conclusion that the Estate repeatedly failed to exercise due diligence, and we see nothing to suggest that its failure to examine the public documents at issue was an exception. The trial court did not abuse its discretion in denying the Estate leave to recall Shelton.

## V. The Trial Court's Finding that the Estate did not Request Additional Documents Prior to Trial

Of the trial court's sixty-two findings of fact (many of which contain several sub-findings), the Estate challenges only its finding that "[t]here was no evidence presented at trial that the Estate ever informed the Defendants before trial that the Estate's CPA's wanted or needed more documentation." Appellant's App. p. 51. Even assuming, *arguendo,* that this finding is clearly erroneous, it can only be considered harmless error. The Estate contends that it presented ample evidence that it requested additional documentation on several occasions and argues that this tends to establish that the Defendants failed to provide it with a proper accounting. Even if the Estate did request additional documentation, however, it simply does not follow that there was an initial failure to provide adequate documentation. Merely requesting additional documentation does not prove that the initial offering was lacking. The trial court's finding in this regard, even if erroneous, can only be considered harmless.

The judgment of the trial court is affirmed.

SHARPNACK, J., and NAJAM, J., concur.